Today's cases will be called as previously announced and times will be as allotted to  The first case today, United States v. Ponzo and United States v. Ponzo, numbers 25-1203, 25-1259, and number 25-1327. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning members of the court, Christian Kiley for the defendant appellant, Mr. Christopher Ponzo and with me is my partner, Max Stern. You may proceed. Judge, help me if I could, I would reserve two minutes for rebuttal. And this is Christopher Ponzo. You may proceed. Yes, thank you. I'm going to start this morning with the issue of forfeiture given the limited time and then I'll address the challenges of the sentencing if I have time. On the issue of forfeiture here, there is no dispute what the law is. In order to obtain forfeiture in an honest services fraud case such as this, the government concedes that it has the burden of proving that the defendant would not have obtained the monies sought to be forfeited but for the payments of the bribes or kickbacks that issue. That's at the government's brief at page 39. Under the but-for standard, and this is a quote from the United States versus Farkas case from the Fourth Circuit, funds are considered proceeds and therefore deemed forfeitable if a person would not have the funds but for the criminal offense. Here, the government sought and obtained forfeiture from Christopher Ponzo in the amount of $13.2 million, which represented every penny of profit he made from clear result in an approximately 10-year period. In order to obtain forfeiture in that amount, the government had the burden of proving that the full $13.2 million was proceeds from the offense, that Chris Ponzo would not have obtained that amount but for his payment of cash and gifts to the two clear result employees, Eric Darlington and Peter Marra. Put another way, to be entitled to forfeiture in this amount, the full amount of profit that Chris Ponzo made during this time period, the government needed to prove that if Chris Ponzo had not given cash and gifts to Darlington and Marra, he would have made $0 from clear result. The government did not come close to meeting this burden, indeed it offered no evidence that Mr. Ponzo would not have worked. Your argument seems to focus on this whole notion of who generated what, as opposed to even if your client generated the sale, he still needed the other two who he was paying and they had to approve his work. Judge Thompson, first, with respect to them approving him as contractor, with respect to Christopher Ponzo, there was no assertion at the Rule 11 hearing by the government that his approval as a contractor was in exchange for any buy payments. In fact, he was approved as a clear result contractor before he had ever made any payment or agreed to make any payment to anyone there. Second... He was approved as a contractor as far as being a contractor is concerned, but I thought the allegation was that even if he was a valid contractor, he still needed the bribes in order to get the specific jobs. So I don't believe that there is, I don't believe there was an assertion by the government that my client agreed to at the Rule 11 hearing or any evidence in the record that Mr. Darlington and Mara approved process jobs that they otherwise would not have approved because of this money. Yes, their position at clear result of field program manager involved going out to buildings, seeing how many light fixtures there were, what type of fixtures, whether they were eligible for upgrade, but these are ministerial functions that were performed and the government admits that it has no evidence that anything was manipulated or inflated about the contracts that Mr. Darlington and Mr. Mara were processing for Christopher Ponzo. So there's no evidence that they did anything out of the ordinary course what they would otherwise do for someone who was not paying them cash and gifts. And the government has... Was there an allegation, at least one allegation that when someone went out to do an inspection they found the energy efficient light bulbs in an area as opposed to installed as they were supposed to be? That is the sum total of the government's evidence that there was any irregularities here with respect to any work performed by Mr. Christopher Ponzo. We have a response to that which is in our brief, but again the government here did not seek to prove, okay, there was a certain percentage of jobs or a certain percentage of profit that is traceable fairly to the offense of conviction here. They went for an all or nothing approach, 13.2... I thought your client admitted to receiving preferential treatment that went beyond just the obtaining of contracts. So he admitted to receiving preferential treatment that the essence of the offense here was cash and gifts in exchange for preferential treatment in the form of Darlington and Mara who were nine to five hourly employees who were not paid any kind of incentive compensation to motivate them to go above and beyond to process the volume of jobs that Chris Ponzo was originating and bringing to clear result. And again, apart from this one anecdote about a pallet of light bulbs at a job site that was found at a random inspection, which is entirely lacking in context, that is not enough to sustain the government's burden of proving that all 13.2 million in profit, every penny of profit that Mr. Ponzo made in this time period, he would not have made but for his payment of bribes and kickbacks. What does preferential treatment mean to you? When he admitted to receiving preferential treatment, what was he admitting to? Well, I think he admitted to, these were employees, again, who had no incentive in their own compensation structure to work outside of normal business hours, to put in the extra hours, the extra time, the extra effort that was necessary to process the volume of jobs that Chris was bringing in. This essentially, these clear result employees, this was essentially a sales job but they were not compensated like a traditional sales role would be. And so Mr. Ponzo took it upon himself to provide that incentive compensation. So if they weren't, as you put it, motivated, that means that your client would not have cleared the profit that he cleared because the jobs that he brought in would not have been processed. So Judge Thompson, I think if the government had approached this differently below, they might have tried to put on proof of, okay, how many extra jobs per week, per month did these individuals process as a result of these payments? They didn't do that. They took an all or nothing approach. Every penny of profit. There can be no question that Chris, who is a approved clear result contractor who had exclusive relationships with these property management companies, who was bringing business to clear result, pursuant to clear results, that's the way the program was designed, the contractors bring in the business, that he is going to get to work jobs and he is going to earn profit through clear result irrespective of any payments. If the payments made a difference at the margins, the government has not put on any evidence that would allow the district court to apportion tainted from untainted revenues and profits. Can you distinguish the Cox case from this court 2017? Because in that particular case, looking at the statute, this court held that the court's order of forfeiture of the entire amount of proceeds obtained as part of the scheme, and in that particular case, all of Cox's proceeds were forfeited, how is that different here? Well, your honor, I'm not exactly familiar with that precedent, but based on your honor's reading of the excerpt from it in the holding, it sounds like there was a determination by the district court that all of the proceeds were traceable to the offense. Here we have a legitimate business operation where Mr. Ponzo is legitimately bringing in millions of dollars of contracts a year, and there's been no showing that he would have made zero dollars were it not for his payments of cash and gifts to Darlington and Mara to motivate them to go the extra mile. Let me ask you also, in this case, do you agree that there has to be some forfeiture? I'm not talking right now, but there has to be, it could be a dollar, it could be a million, it could be some... Yes, your honor, so for purposes of sentencing and forfeiture, there was a very small number of jobs, 1.2% measured by revenue, the profit number attached with that is about $160,000 that were assigned to Mr. Ponzo, that were not originated by Mr. Ponzo, but were assigned to him by Mr. Darlington or Mara. For purposes of sentencing and forfeiture, we do not contest that that may be deemed properly proceeds traceable from the offense, but that's $164,000, it's not $13 million. May I? Yeah, go ahead. You raised several issues relating to the procedural aspect of the forfeiture, so the timing of no preliminary forfeiture order, and then the timing of when you learned of the forfeiture amount, and I think some other arguments as well. Which of these is your best argument, and can you point us to a specific harm that came from it? Your honor, I think it is the totality of the circumstances and the effect that Mr. Ponzo got no opportunity to contest forfeiture. If it was just the failure to enter a preliminary order standing alone, maybe we wouldn't be making this argument, but there was no preliminary order entered, there was no indication by the government to probation the amount of forfeiture they were going to seek, that portion of the PSR was left blank, there was then no mention of it even at the sentencing hearing, no mention of it in the government's sentencing memo, the amount of forfeiture they were going to seek. At the very end of the sentencing hearing, the government said that they were going to seek $13.2 million in forfeiture, and asked Lee to file a motion, and said obviously the defendant would then have an opportunity to respond. The government filed that motion, we had two weeks under the DMAS local rules to respond, we went to work on a response, in the meantime the court, without extending the deadline, entered the government's requested forfeiture in the amount of $13.2 million, we then moved to reconsider, which the court did not even entertain until after this appeal had been filed and jurisdiction was divested from the district court. So it was really the sum total of all of these procedural errors that Mr. Ponzo never had an opportunity to contest the forfeiture to put on this evidence to hold the government to its burden of proof, and there was no evidence supporting the court's finding of $13.2 million in profits that would not have been obtained but for the payments to Darlington Amaro. If you want to briefly, 90 seconds, discuss any issue you want to address about your client's financial... Thank you, Your Honor. So first of all, the court applied three different enhancements that probation had found none of them applied. The court did so without making any factual findings whatsoever, it simply stated on the record of the sentencing hearing that it agreed with the government that the given enhancement applied. The result of these three enhancements was to increase the guidelines range by 11 points, and so there was the failure to make factual findings, which requires reversal. The only exception that this court's precedence recognizes when there is a satisfactory surrogate in the record, such as where probation has recommended that the enhancements apply and has made what are tantamount to findings of fact, that did not occur here because probation concluded that the enhancements did not apply. So you then have a situation where there was an incorrectly calculated guideline range, which the court then departed upwardly from based upon an erroneous finding of $13.2 million in gain from the offense, which is erroneous for all the reasons we've put forth in connection with forfeiture. And so for those reasons we believe that the sentence must be reversed, it should be remanded, and in that connection I would renew Mr. Ponzo's motion for release pending appeal. If it's not granted and if his sentence is reversed, he will likely, in all likelihood based upon his anticipated release date, be denied the benefit of that ruling. Okay. Thank you, Counsel. And if you're going to renew that motion, it has to be filed, so. Okay. Thank you. We will do so. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant, Joseph Ponzo, please introduce himself on the record to begin. Good morning, Your Honors. May it please the Court, my name is Michael Connolly and I am the Counsel to Joseph Ponzo. I'd like to reserve one minute of my time for rebuttal. And I also, just to put the Court on notice, will also be filing a motion to renew the release of the defendant because his sentence would in all likelihood expire before the Court reaches a decision here. I'd like to begin, Judge Thompson, to address a question that you posed to my colleague because it's a little different as the facts relate to Joseph Ponzo, my client. Your question was, did the bribe payments affect the approval of Mr. Ponzo, in this case, Joseph Ponzo, as a contractor? And while there is evidence that bribes were being paid by Christopher Ponzo at the time that Joseph Ponzo and his company, which is called Airtight, was approved, there's no evidence, literally none, that he was approved because of the bribes. And it's the government's burden under forfeiture law to prove by a preponderance that but for the bribe payments, the tainted proceeds wouldn't have been received. The evidence on this issue is no bribes were needed for Joseph Ponzo's approval, for Airtight's approval. Clear Results Multifamily Program Director Kevin Cote testified, one of the objectives of the program was to grow the number of contractor participants. Clear Result had an open-door policy with contractors as long as the contractor submitted one, a participation agreement, and two, passed a background check. Mr. Ponzo, Joseph Ponzo, and Airtight passed both of those requirements. So the government had the burden to prove that the proceeds were derived from, that all of the profits earned by Airtight, which is $3.6 million, were tainted. And I believe the government's argument hinges largely on the contention that Mr. Ponzo wouldn't have been approved as a contractor had the bribes not been painted. Mr. Cote also testified that... Your client didn't have any experience doing the kind of work that he was approved to do. That's correct, Your Honor. And I subcontracted the work. But addressing your point about the qualifications, you're saying that approval, were there other instances where people who had no prior experience were similarly approved? I mean, that would work in your favor if there was. I'm not aware of that type of precedent, Your Honor. However, the company was owned in name by Christine Ponzo, Joseph Ponzo's wife. She did take courses to prepare her and to render her qualified to be licensed to run a contracting business under Massachusetts law. And the function of Airtight in this arrangement was to serve... To do the kind of weatherizing that they were approved to do? No, it was more, these were management-related courses that she took, but it functioned, Airtight functioned as a management company. The work was done by a subcontractor, which was skilled in the type of remediation work that was done. And there is no prohibition in the clear result program to prevent a company from being qualified and then engaging a subcontractor, which was duly skilled in performing this kind of work, to do the work. And that's what happened here. And what's most important, I respectfully submit, is that all of the work for which Airtight was paid was subject to inspection by Clear Results Independent Inspection Company, and it was approved. In those instances where there were errors found in the quality of the work, Airtight, Mr. and Mrs. Ponzo, and the subcontractor went back and addressed those issues. So at the end of the day, Your Honor, on the issue of forfeiture, the government had the that all of its work was tainted somehow by the bribe payments. And I believe that they're relying heavily on the fact that it was approved through bribe payments. But the approval process was one... Did Darlington and Mara, are they the individuals who did the approving? Darlington did. Mara followed Darlington. Right, but I mean, did they do the actual approving of the work itself? No, the approval of the work was done by an independent inspection company. So there was no bribe taint to that approval. But your client becomes the mass-saves contractor in part due to the bribery that's happening with Darlington and, sorry, I'm forgetting, Mara, right? I didn't hear the first part of your question, Your Honor. Your client, his company becomes a mass-save contractor in the first place due to that relationship it has with Darlington and Mara, right? Well, I believe the obtaining of the license is a separate function, but the license was obtained so as to do this work. It was not a pre-existing company. Right, but did Darlington and Mara, are they the individuals responsible for approving the license? I think that's what Judge Montecalvo was asking. Who approved his license? Was it these two or somebody else? Well, I believe that Mara, well, Mara I don't believe was involved at the point in time that Airtight was approved, but I believe Darlington did have a role. In any event, the criteria for being approved as a contractor are objective. They needed to have insurance. They needed to have a license. They needed to pass a background check. These are all objective criteria, which indisputably Airtight and Joseph Ponzo and his wife and the subcontractor passed. So the objective criteria were satisfied, and under the policy of having an open door encouraging contractors to come in and do this work, there was no reason to believe there was any taint from the bribe payments. And to the extent that there may have been a taint, the burden is on the government to establish that. And the government didn't even ask Mr. Darlington, who was both interviewed and testified before the grand jury, they didn't even ask him whether he approved Airtight as a contractor because of a bribe payment. They didn't ask that question, I respectfully submit, because the answer would have been no. Airtight unambiguously without any qualification qualified as a contractor for the clear result program. What is your position on what restitution is owed, if any, here? In this case, based upon the study that was done by Kroll, the forensic accounting work, they determined that 4.6% of Airtight's revenues are traceable to contracts that were not directly earned by Christopher Ponzo's referrals. So in other words, Christopher Ponzo was responsible for the overwhelming majority of contracts that Airtight worked on. And under clear results policy, when a contractor finds a job, under its policy, that contractor is entitled to do the work. And in this case, Christopher Ponzo shared the work with Airtight. 4.6% of the contracts were not initiated by Christopher Ponzo, and therefore, I would submit that 4.6% times Airtight's profit, which is $3.6 million, is the appropriate measure for a forfeiture, in this case, which is $165,600. If I may, I see that I'm almost out of time. I just want to mention that on the sentencing side, there are two clearly erroneous facts here. One is the fact that Judge Gordon said that Joseph Ponzo made $10 million in connection with this bribery scheme. Mr. Ponzo's company wasn't even paid $10 million. Nobody alleged, there's no evidence of Mr. Ponzo or his company receiving $10 million. The revenue was $7.6 million, and the profits were $3.6 million. So that is a clearly erroneous finding, which even under a plain error standard, we did not register an objection below. But under a plain error standard, the error occurred. It's clear and obvious. It affected the defendant substantially. Isn't that a waiver? Wasn't it waived? Because it wasn't objected below. Well, because there was no objection, Your Honor, I think the court would apply the… And there's also, if you go to pre-sentence report, I believe there's no objection to report. So there's no objection to report, and then no objection in sentencing. Well, the $10 million finding was not in any of the pretrial submissions. It wasn't in the PSR. It's something that was announced by Judge Gordon literally seconds before he pronounced sentence. And under the clear error standard, Your Honor, one of the principal factors is whether the error affected the defendant's substantial rights. Because Judge Gordon mentioned that Mr. Ponzo earned $10 million immediately before pronouncing sentence, and that he was basing his sentence on the greed and avarice of Mr. Ponzo, it's clear that that error affected his substantial rights. What's the second clear error? You said there were two. What's the second one? The second one relates to the tax loss amount. The government relied upon Exhibit 4 to its sentencing memorandum in determining the tax loss amount. Exhibit 4 is a listing of gift card transactions, which the government contends are all a basis for fraudulent tax deductions. We don't dispute that. But the government contends that when you add up all of those transactions, it amounts to $300,000. This is an arithmetic issue. We did not… You argue it was not $300,000. It was $118,000 and some change. But where do you get that number from? Adding up the looking at the exhibit and doing the arithmetic…  It's Exhibit 4 to the government's sentencing memorandum. Is that the… I'm sorry. Is that the exhibit with, you know, I don't know, hundreds of pages? There are many pages. It's a long schedule. Where in Exhibit 4 do I get the numbers to add up to $118,000? So Exhibit 4 is a transaction-by-transaction listing of expenditures. And if the court were to add all of those, it adds up to just under $119,000. It's in the record. It's cited in our brief. Any other questions? Okay. You have one minute rebuttal. Thank you. Thank you. Hear from the government now. Counsel, please introduce yourself on the record when you're ready to begin. Good morning, Your Honors, and may it please the Court. Lauren Maynard for the United States. Your Honors, I will start with this forfeiture issue, which relates directly into the issue of what the defendants made from the scheme. I think, first of all, there are a couple of basic factual issues I would like to clear up. What about the procedural posture of the challenge? As far as the procedure goes, Your Honor, the government concedes that there were procedural errors below. However, those errors were harmless. The defendant— Why was it harmless when they didn't have a chance to contest the amount that the court came up with? Well, effectively, the defendant did end up having the opportunity to contest the amount. He was on notice of the amount, and the government concedes it had not listed that amount as the amount it was seeking in forfeiture prior to sentencing. However, as the defendants were just talking about with respect to this gain issue, the government listed that $13.2 million amount repeatedly throughout the process. The defendant was well aware that that was the government's position with respect to what the defendant gained, in other words, the proceeds from the offense. So the defendant was aware of that. Now, again, the government had asked when it moved for forfeiture. There was still this nexus obligation that the government had to prove. So listing a number doesn't give them the kind of hearing that they're entitled to. Your Honor, that goes back to the fact that it's related to this gain issue. And as the government set forth in its motion for forfeiture, it explained the nexus, which was also explained with respect to gain. And again, the court didn't reach gain because it did not find a loss under 2B1.1, but the issue was argued below. It was briefed by the government. The government explained this is the government's belief as to the amount that was gained from the offense, and this is the reason why. The defendant was aware of that. He made arguments in response to that in his sentencing memo and at sentencing, and those same arguments were the arguments that he made when he later submitted in opposition to the court's forfeiture order. The court had those arguments. It's just odd because the court issues its decision on forfeiture before it ever hears from the defendant. Your Honor, I agree that that is odd. And it should not have happened that way. It should have been after the defendant submitted his opposition to that. However, he did later submit that. The court clearly considered those arguments. How do we know that? Because the court addressed them later, and the court said that it considered those arguments and found them, quote, ludicrous. Those were before the court. Again, it goes back to the same issue that we are dealing with with this gain issue. The court considered it. The defendants, in their sentencing memorandum, in arguments made at sentencing, talked about this theory that you just heard about as far as, you know, only those contracts that these two particular employees sourced and brought in. That was their argument from the very beginning, that those were the only contracts they considered tainted by the fraud. The government was clear in its position that that was not the case, that this was a pervasive scheme that affected every contract. The court considered that argument. It explicitly said in its later ruling. Well, why don't you tell us how it affected every contract? So I'll step back for a picture, a minute, and give you the big picture of what we're really talking about here. So the government's argument. Well, the defendants claim that the government did not put on evidence of how their fraud tainted these contracts, but I respectfully disagree. The government put on evidence that the defendants paid bribes on a regular basis, totaling over millions of dollars. This included cash payments, weekly cash payments, a $25,000 tractor, cash handed over in envelopes. The government presented this evidence of the scheme that went on for years, for nearly ten years. What did Darlington and Mara do? So Darlington and Mara had a number of discretionary functions, and the government set this out in the indictment, at the Rule 11 hearing, in its sentencing memorandum, and in arguments at sentencing. They had a number of functions beyond just picking out a contract, besides sourcing that contract. There were a number of other things that they were involved in doing. What's your best argument for why all of these profits are traceable to the offenses here? Your Honor, I believe it goes back to this broad, pervasive scheme, that these bribes were paid on a consistent basis. What did they do? You were saying all of this stuff is in your written material, but you never did get to what actually they do, they did. Yeah, they had a number of functions. It included, at times, sourcing a job in the first place. But even after a job was sourced, they had to go out to the job site, they had to scope the project and determine the amount of that contract. They had to decide whether, from a cost-benefit perspective, because, again, this is a program that's supposed to result in energy savings, if you're paying too much for the work, you don't get savings. So that was part of what they did. They looked at these projects, they decided whether it was worth issuing a contract, and if so, they approved it. They then scoped the contract, they created the numbers, what the cost of the contract would be. Later, they physically, this was more of an administrative job, but they actually processed those contracts, and that's something that you heard the defendants talking about. Is there any evidence that the money that they accepted impacted what they submitted as the proper scope of the work? Could you repeat that question? Excuse me. Is there anything to suggest that the money that they received as bribes impacted, for instance, the scope of the work that you're saying that they were required to do? Yes, Your Honor, there is evidence of that. Again, it's difficult to tie a specific payment to a specific job because these were payments that were made regularly. Give us one example of what you're talking about. On the scope of the work, it was easiest to see with respect to the air sealing. That was the Airtight Company, and there was one specific example that Before Airtight got involved, give me one example of scope of work involving Christopher Ponzo that you're saying was clearly changed. Your Honor, I don't know if this was before Airtight was involved or after, but with respect to Christopher Ponzo, the government cited at least one example where there happened to be a spot check and the work was not done properly. That was the light bulb work? That was the light bulb work, yes. Anything else? Following that, Clear Result did an investigation into some of Darlington's work and found that he had scoped projects that he should not have. This goes back to the cost-benefit analysis. So sometimes it might have been cost-effective to change all the light bulbs for energy savings. Was this in evidence? Yes, Your Honor. Let me ask you along those lines. I asked opposing counsel for Christopher Ponzo about the Cox case. Is your argument, and I know you cite the Cox case at page 42 or 43 of your brief, is that sort of like the theory, you understand this is analogous to what happened in Cox? Yes, Your Honor. We believe these are all the proceeds from the fraud. Again, it's the pervasiveness of this fraud that affected every contract. It wasn't a specific this for that on a specific contract. It was just the understanding. If you go contract by contract, you need to see the whole big picture. Exactly. It would be impossible to go contract by contract because that's not how the scheme worked. It wasn't get me this specific contract and I will give you money in exchange for it. These were regular weekly cash payments over the course of nearly 10 years. The brother counsel said that there were independent inspectors after the fact who took a look at the work that was done. I assume this independent contractor inspected the work orders as well as the work produced itself. Was there any evidence submitted that these independent inspectors found the work wanting? A couple of points on that, Your Honor. First of all, the independent inspectors who went out, they didn't go out after every job. That was more of a spot check that occurred occasionally. It wasn't every single job. Part of Darlington and Mara's role was to do inspections and to go out and make sure that the work was being done properly. Another point on that is that part of the preferential treatment received, and again this is something that the government presented, something the government presented during the Rule 11 hearing, is that one thing that Darlington and Mara would do is give advance notice at times of these inspections. To address your specific question, the government did present evidence of independent inspectors finding issues. Again, they didn't do this for every job. We don't have this for every single job. Besides the light bulbs, give me an example of an independent inspector finding defects. There was one job in particular that Airtight did. I believe it was the Pine Hills job. The independent inspectors went and they found that a lot of the work simply had not even been completed. But beyond that, they dug further into the scope of the work. When they looked at the original contract that had been approved that Peter Mara put together, they found that it overestimated by over 1,000 hours the number of hours that would be required to complete that job. That's just one example, but when you see that large of a discrepancy and you know that these people are receiving regular bribe payments, there's an inference there that this is happening on the regular, or else what's the point in paying the bribes? Let me ask you, when you say there's a pattern of regular bribe payments, let's assume we have 100 bribe contract payments, and let's assume number 1 to 10 are bribes, and then 11 to 15 are not necessary bribes, and then bribes again, and you see kind of some yes, some no. Would they all still fit in for purpose of forfeiture because there's a bribe pattern, even though some may not be the result of a particular bribe in that particular contract? Yes, Your Honor, I believe so. There is a world in which maybe some of these contracts would have gone to the defendants anyway. It is impossible for the government to prove that or to know that because of the nature of this scheme. Now, for purposes of forfeiture, the calculation is not an exact science for that very reason. The court is permitted to make these reasonable inferences based on the evidence presented, and that's what was presented here. Now, again, the defendants, maybe, maybe it's possible that some of these contracts they would have gotten anyway, we will never know, because the fact is they were paying these bribes on a regular basis for nearly 10 years. Could the judge below have said, I'm making this finding, it's 13.2 million. In the case of the other brother, it's this other amount, but because there are some in between contracts that I'm not 100% sure, I'll deduct like 20% or 25% off, which should be. The judge could have done that, right? He could have done that, yes, he could have. But if he doesn't do it, even from 1% to 10%, 20%, or even 0%, is that his discretion or is it something we would have to review otherwise? I do believe that's his discretion, especially in a case like this that could vary on a case-by-case basis, but in this particular case, when you look at these numbers, the defendants paid millions of dollars in bribes and yet claim that they only received less than $200,000 in benefits from that. It was perfectly reasonable for the district court to say that makes no sense. I don't buy that argument, and that's exactly what the court found. And the standard here is preponderance also, correct? Correct, Your Honor. And another point that I do want to make on that, this was mentioned by the defense earlier, they said that the government was counting every penny of profit that Cap Electric earned over a 10-year period. That is not true. The scheme lasted for a 10-year period. However, the government sought forfeiture only for the years 2014 through 2020. That's because the government did not have the tax returns from 2013, 2021, and 2022. So even that $13.2 million number is, in fact, under-inclusive of the proceeds that the defendant made. Quick question on the tax loss, which let's just ignore the affirmative waiver issue. The government, you sort of acknowledge Exhibit 4 is maybe not the best thing for us to look at, and you point to figure out whether $300,000 is the accurate number, and then you point us to the PSR. But when I look to the PSR, it seems to be sort of summaries of things rather than the actual evidence of what was the amount of the gift cards. How can we figure that out from the record here? Yes, Your Honor. So the government included only the summary charts. That's what's in the PSR. That same summary chart is referenced in the government sentencing memo. This is what was calculated by the IRS to determine this tax loss. The documents underlying that summary chart are thousands upon thousands of pages. These are records that were collected from Home Depot, Staples, and Lowe's showing every gift card purchase that the defendant made. The defendant has access to those records. I thought you conceded in your brief that his addition for Joseph was correct and that it was, I thought you were alleging a mathematical error. No, Your Honor. It was. No. So let me clear that up. The summary chart that was included in the government sentencing memorandum that was included in the PSR, that is correct. Exhibit 4, which is the one the defendant takes issue with, that was simply a summary. It was a chart of some gift cards. So some of the gift cards purchased were, for example, these Visa gift cards. So you don't know what they're used for. As a result, the government subpoenaed records from those companies to see what the gift cards were spent on. That's what Exhibit 4 represents. There were other gift cards purchased. There were some that records were not obtained for. There were some that were clear from the face of what the gift card was. For example, a Sephora gift card was not something that was used for airtight business purposes. I would also point out the fact that the defendant agreed during the Rule 11 hearing that he purchased almost $300,000 in gift cards to disguise personal purchases. That's a fact that was stated to which he agreed. And it's that $300,000 figure that the IRS used and the underlying documents that added up to that $300,000 figure to calculate the tax loss. Okay. Counsel, if you want to address the sentencing arguments, you have about three minutes left. Yes, Your Honor. Well, let me ask you this question about the enhancements. The district court says, I agree with the government, and then applies the enhancements. But the government said a lot of different things about those enhancements. So do we really have enough to determine the basis of what the district court found? We do. The government was clear in the arguments that it made with respect to each of the enhancements. And so when the court said, directly following the government's arguments, I agree with the government, you can look at the record and it's clear what the court was referring to. And with respect to the obstruction enhancement, with respect to Chris Ponzo, the court specifically listed each of the three reasons that the government gave for that enhancement to apply. Now, with respect to Joseph Ponzo, of course the government had not just given an argument. The court said that it adopted the recommendation of probation and the government. So that leads us back to the PSR, where then you see those same arguments laid out. In the case of Joseph Ponzo, some of these arguments were not raised. There were no objections to PSR, and then they weren't raised. The government's claiming there's waiver, correct? With respect to which one? Joseph Ponzo. Anything else, counsel? I believe initially Joseph Ponzo did make objections to the PSR with those enhancements. It was the PSR later came back and recommended the enhancements, as opposed to Christopher Ponzo, the PSR, did not apply those enhancements. So that was the difference when we got to the sentencing stage. Anything else, counsel? Not unless there are any further questions. Okay, thank you. Thank you. We'll do the two and one minutes of rebuttal. Please introduce yourself back on the record. Christian Kiley for the defendant, Mr. Christopher Ponzo. Your Honor, Ms. Maynard just admitted that the government admits that it cannot apportion tainted from untainted proceeds here. That's the government's burden, and it admits that it can't satisfy that burden. There was a suggestion. Could you respond directly to her argument that it all had to be tainted because there were bribes paid regularly and systematically? So I understand that's the government's argument, but what she suggested is that because bribes were being paid, that necessarily there was some manipulation of the contracts or inflation or that Darlington and Mara were approving jobs that otherwise would not have been approved. There is zero evidence of that, that these jobs that Chris Ponzo was bringing in were not eligible through the Mass Save program. They were eligible. There's no evidence to the contrary. Your Honor asked Ms. Maynard to provide examples of irregularities other than this isolated example of a pallet of light bulbs that was found at one of the job sites. All of the examples she cited were related to work performed by airtight, and I don't think she's right about the fact that there were irregularities there, but they don't pertain to the electrical work being performed by Mr. Christopher Ponzo's company. With respect to forfeiture and the admitted errors in procedure there... She said that the work was inflated. That's an allegation by the government, Your Honor. There's no evidence of any inflated... She made a suggestion that work was inflated, airtight work, air sealing work. We don't think that's right as a factual matter. I'll let Mr. Connolly respond to that. It does not pertain to Cap Electric, my client Christopher Ponzo's company. With respect to forfeiture under the Honeycutt case, the only monies that can be forfeited from Christopher Ponzo are monies that he obtained. Monies earned by his brother Joseph Ponzo in airtight are not monies that can be forfeited from Christopher Ponzo. Again, there's no showing that any money earned by Christopher Ponzo was tainted in any way, was the result of any irregularity, was the result of any job that was not otherwise eligible and was approved because of bribe payments. Your position is that the regular payment of bribes alone is insufficient for there to be a reasonable inference that the work was tainted. I think that's right, Your Honor. We admit that that is an honest services fraud offense and that's why Chris Ponzo pled guilty. But the honest services fraud does not necessarily entail economic loss to the victim or economic gain to the defendant. It can, but it does not necessarily entail that. The government has to prove that there is economic loss or gain, that there are profits that would not have been obtained but for the offense. And here, as in the Cadman-Simon cases, which applied a very closely analogous forfeiture statute under the racketeering statute, where you have a legitimate business operation, the district court needs to take care to determine what proceeds of that business are not tainted and those that are tainted. The government did not put forth any evidence that would allow the district court to make that determination and the district court certainly did not undertake any analysis that would allow it to make that kind of determination. This was an all-or-nothing proposition. Thank you, Counsel. Would Counsel for Mr. Joseph Ponzo please introduce himself and the record beginning in one minute? Just two quick points. One on the argument that my sister made about airtight doing work that can be linked to the bribe payments because there was an overestimation of the number of hours needed to do the work. That is an issue that was aggressively investigated before the grand jury and it was aggressively advocated to the court below. The probation officer rejected that argument and the court rejected that argument in both finding that there was no loss under these circumstances to Clear Result, to Eversource or National Grid, the two utilities involved, or to any of the customers. And there were witnesses called before the grand jury, such as Kevin Cote, who testified that the practice at Clear Result is it establishes an estimate of the hours that will be required and on some contracts the contractors are big winners, on other contracts they aren't. Can I address the second point, Your Honor? Very briefly, 30 seconds. In regard to the summary chart on the IRS tax loss issue, the number on the summary chart is 305,000 related to the gift cards. This is the same source that's used on that extensive schedule that I referred to before, which is erroneous. The court's relying on the same erroneous information and the government admitted that it was erroneous and admitted that it was not able to obtain purchase records for all of the 300,000. It could only obtain purchase records for 119,000. That's the full amount of the tax fraud that it could prove. That's the amount that should have been used by the district court. The burdens on the government and speculation is insufficient. How do you explain that difference? I know it's not your burden, but how do you explain it? So the government states in this chart, which we've been talking about, and in describing the schedule that there's $300,000 in gift card expenditures which were used for personal reasons and therefore taking that $300,000 and using it as a tax deduction was improper. When you look at the schedule, it's only 118,000. I'm trying to figure out where the $300,000 came from in the first place. That's a good question. That's a good question. All we have is a list of about 119,000, and the government admits that those are the only gift card expenditures which it could obtain documentation of to see how the monies were spent. So the rest should have been disregarded by the district court because it relied entirely on speculation. No records admitted by the government. Thank you, Counsel. Thank you, Counsel. That concludes argument in this case.